# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
Civil Action No:

SYREETA LANE,

      Plaintiff,

v.

WELLS FARGO BANK, N.A.,

      Defendant.

**COMPLAINT**
**(Jury Trial Demanded)**

Plaintiff Syreeta Lane, by and through undersigned counsel, brings this action for violation of Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq., and alleges the following:

## PARTIES, JURISDICTION, & VENUE

1. Plaintiff is an African American female who has been aggrieved by Defendant's actions. She is and has been, at all relevant times, a resident of Charlotte, North Carolina.

2. At all times relevant, Plaintiff was employed by Defendant.

3. Wells Fargo Bank, N.A., ("Defendant" or "Wells Fargo") is an entity formed under the laws of South Dakota, registered to do business in North Carolina, with an office located at 401 South Tryon Street, 15th and 16th Floor, Charlotte, NC 28202, where Plaintiff was employed. According to filings with the North Carolina Secretary of State, Defendant's principal office is located at 464 California Street, San Francisco, California 94104.

1

4. At all relevant times, Defendant was an "employer" within the definition of ADA, 42 U.S.C. § 12101, et seq. (specifically, 42 U.S.C. § 12111(5)) on the basis that it employs more than 15 employees.

5. At all relevant times, Plaintiff was an "employee" of Defendant within the definition of ADA, 42 U.S.C. § 12101, et seq. (specifically, 42 U.S.C. § 12111(4)).

6. At all relevant times, Defendant was, and is, an "employer" within the definition of FMLA, 29 U.S.C. § 2611(4)(A) on the basis that it employs more than 50 employees.

7. At all relevant times, Plaintiff was an "eligible employee" within the definition of FMLA, 29 U.S.C. § 2611(2)(A), on the basis that Defendant employed Plaintiff for at least 12 months, and Plaintiff performed at least 1,250 hours of service for Defendant.

8. At all times relevant to this action, Defendant possessed and exercised the power and authority to direct, control and supervise the work performed by Plaintiff.

9. This Court has original jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claims under the ADA and FMLA because the claims arise under the laws of the United States.

10. This Court has personal jurisdiction over Defendant because Defendant conducts business in Charlotte, North Carolina, which is located in this judicial district.

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was hired to work in this district and Defendant conducts business in this district.

## EXHAUSTION OF FEDERAL REMEDIES

12. On or around December 5, 2024, Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant engaged in disability discrimination, race discrimination, and retaliation in violation of the Americans with Disabilities Act and Title VII of the Civil Rights Act of 1964.

13. On February 9, 2026, the EEOC issued a Determination and Notice of Rights to Sue. Plaintiff timely brings this action within ninety (90) days of her receipt thereof.

14. Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## STATEMENT OF FACTS

### *Employment History and Background*

15. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

16. Plaintiff commenced employment with Defendant in January 2008. In August 2013, she transferred to the Internal Audit Department, where she began working as a Senior Lead Auditor.

17. Plaintiff maintained a position in the Internal Audit Department at all times relevant to this Complaint.

18. In September 2018, Plaintiff was promoted to a management-level position, initially titled Principal Auditor and later re-titled Lead Audit Manager in connection with a company-wide restructuring of role designations. The underlying responsibilities of the position remained the same throughout.

19. As a Lead Audit Manager, Plaintiff's role consisted of performing independent, objective assurance and risk management activities, including conducting process, risk, and control assessments, as well as leading audit engagements in accordance with professional standards and regulatory requirements.

20. Plaintiff's audit work was conducted entirely in a virtual environment throughout her entire tenure in the Internal Audit Department. Every aspect of her audit responsibilities,

3

including gathering evidence, testing controls, managing engagement teams, communicating with clients, and documenting findings, was accomplished remotely without any need for physical presence in an office.

21. Further, Defendant's clients were located across the country in different offices, cities, and regions. As such, all of Plaintiff's business communications with clients were conducted via telephone, email, or video conference.

22. At all relevant times, Defendant employed an Audit Director and/or supervisor named Jona Mendoza (hereinafter "Ms. Mendoza").

23. Ms. Mendoza, in her capacity as Audit Director and/or supervisor, possessed and exercised the necessary authority to act on behalf of Defendant. This authority included but was not limited to making decisions, implementing policies, conducting and approving performance reviews of subordinate employees including Plaintiff, exercising supervisory control over the audit team, and undertaking actions central to the allegations contained herein. Such authority was vested in Ms. Mendoza by virtue of her position, and her actions and decisions in her capacity as Audit Director and/or supervisor are attributable to Defendant.

24. At all relevant times, Defendant employed Rose Ann Poquiz (hereinafter "Ms. Poquiz"), who served as Auditor-in-Charge and reviewer on the Corporate Strategic Planning Horizontal audit, an engagement on which Plaintiff performed work in 2023.

25. Ms. Poquiz, in her capacity as Auditor-in-Charge, possessed and exercised the necessary authority to act on behalf of Defendant. This authority included but was not limited to making decisions, implementing policies, conducting and approving performance reviews of subordinate employees including Plaintiff, exercising supervisory control over relevant

4

audit teams, and undertaking actions central to the allegations contained herein. Such authority was vested in Ms. Poquiz by virtue of her position, and her actions and decisions in her capacity as Auditor-in-Charge are attributable to Defendant.

26. At all relevant times, Dennis Aquino (hereinafter "Mr. Aquino") was employed by Defendant as a Senior Audit Manager. Mr. Aquino became Plaintiff's direct supervisor on August 27, 2023.

27. Mr. Aquino, in his capacity as Senior Audit Manager and Plaintiff's direct supervisor, possessed and exercised the necessary authority to act on behalf of Defendant. This authority included but was not limited to making decisions, implementing policies, conducting and approving performance reviews of subordinate employees including Plaintiff, exercising supervisory control over the audit team, and undertaking actions central to the allegations contained herein. Such authority was vested in Mr. Aquino by virtue of his position, and his actions and decisions in his capacity as Senior Audit Manager are attributable to Defendant.

### *Plaintiff's Documented Disability & Prior Accommodations*

28. In December 2014, Plaintiff was diagnosed with Multiple Sclerosis ("MS"), a chronic neurological condition that affects the central nervous system and substantially limits several major life activities. As a result of her MS, Plaintiff experiences significant impairments to her immune system function, mobility, cognitive abilities, and other major bodily functions.

29. Plaintiff notified Defendant of her diagnosis in or around March or April of 2015.

30. Plaintiff experiences a broad range of physical and cognitive impairments as a result of her MS. These include sleep disturbances, persistent fatigue, cognitive impairment, strength

5

and sensory deficits, gait imbalance, coordination difficulties, and bladder dysfunction. Together, these impairments substantially limit major life activities including but not limited to walking, sleeping, concentrating, operating major bodily functions, thinking, and working.

31. Plaintiff's MS has significantly compromised her immune system, placing her at higher risk of infection than the general population. Exposure to a shared open-office environment, where contact with airborne illness cannot be avoided or controlled, poses a substantial and ongoing risk to her health and safety.

32. Consistent with these limitations, Plaintiff's treating physician has determined that working in a shared office setting presents a significant medical risk to Plaintiff. Plaintiff's need to avoid such environments is therefore medically necessary and not a matter of personal preference for remote work.

33. Plaintiff takes these risks seriously in all aspects of her daily life. She routinely limits her exposure to shared or public spaces, wears a mask when outside her home, and avoids close proximity to individuals who are visibly ill or exhibiting symptoms such as coughing, in order to reduce the likelihood of infection.

34. Plaintiff's condition further requires intermittent absences for medical appointments, MRI scans, and treatment of MS symptom flare-ups.

35. In or about 2020, Plaintiff submitted a request for reasonable accommodation seeking approval to work remotely on a full-time basis, as well as intermittent leave as needed for medical appointments, treatment, and symptom flare-ups.

36. Defendant approved Plaintiff's request in full without issue.

37. In 2021, 2022, and 2023, Plaintiff renewed her request for full-time remote work and intermittent leave as needed ("telework accommodation").

38. On each occasion, Defendant again approved Plaintiff's requested telework accommodation in full, permitting Plaintiff to continue working remotely on a full-time basis through July 2024.

*Plaintiff's Performance Background*

39. At all times relevant, and as demonstrated by her performance record, Plaintiff was able to perform the essential functions of her job with the telework accommodation.

40. From November 11, 2022, through March 12, 2023, Plaintiff was on approved FMLA leave.

41. From the time of Plaintiff's promotion to a management-level role in or about 2018 through her return from FMLA leave in 2023, Plaintiff's ability to perform the essential functions of her position while working remotely was never questioned. To the contrary, Plaintiff consistently performed satisfactorily, receiving "Meets Expectations" performance ratings and positive feedback from multiple supervisors. Illustrative examples include the following:

   a. In Plaintiff's 2019 year-end performance evaluation, supervisor Timothy King rated Plaintiff's performance as "Meets" and stated that "[Plaintiff] works hard to learn and understand the technology identified and to complete the audits on time and on budget . . . . She is also very willing to help others when necessary and shows she is ready to help where she can on an audit."

   b. In Plaintiff's 2020 year-end performance rating, supervisor Brian Mapungwana rated Plaintiff's performance as "Meets."

7

c. In Plaintiff's 2021 year-end performance evaluation, supervisor Karen Hogan rated Plaintiff's performance as "Meets" and stated as follows: "Overall, [Plaintiff] does a good job as Principal Auditor. She continuously works hard to complete testing within budget and coaches team members to help make the team better. She continues to build her level of subject matter expertise in relation to knowing the business being audited."

d. In Plaintiff's 2022 mid-year review, supervisor Karen Hogan rated Plaintiff's performance as "Meets" and stated as follows: "Overall, [Plaintiff] has done a nice job in her role and is meeting expectations for a Lead Audit Manager." Ms. Hogan went on to explicitly recognize Plaintiff's strong leadership as an Auditor-in-Charge ("AIC") and co-AIC, stating that Plaintiff "does a good job on leading work as the AIC/co-AIC and coaching junior team members to help them with their development," is "working solo on the LIBOR project audit for the second consecutive year," and "is always professional and positively influences the team to get the engagements completed on time."

e. In Plaintiff's 2022 year-end performance evaluation, Audit Director Jona Mendoza rated Plaintiff as "Meets" and acknowledged that Plaintiff's "[p]erformance outcomes consistently met expectations."

***Discriminatory and Retaliatory Treatment Following Plaintiff's Return from FMLA Leave***

42. In or around July or August of 2023, after returning from FMLA leave in March 2023, Plaintiff received her first negative performance review. In her 2023 mid-year performance review, Audit Director Jona Mendoza rated Plaintiff as "Inconsistently Meets Expectations."

8

43. Because Plaintiff had been on leave through March 12, 2023, her mid-year evaluation covered only her limited post-return work. The primary engagement completed during this period was the Credit Sales & Trading – HGHY audit, which ran from May 5 through June 28, 2023.

44. Ms. Mendoza did not directly observe Plaintiff's performance on this engagement and therefore necessarily relied on the engagement feedback of those who did.

45. The Credit Sales & Trading - HGHY engagement feedback was favorable and did not indicate that Plaintiff failed to meet performance expectations. Specifically, on July 18, 2023, audit reviewer Timothy King formally recorded that Plaintiff "[w]orked independently to complete specific assigned testing areas," "[w]orked diligently with the business auditors and the business to identify and define the controls to test to meet the testing deadlines," "[t]ook responsibility for working the assigned areas to completion," and "[w]orked well with the business contacts in requesting information and working to clarify any questions." Mr. King noted no areas of concern regarding documentation or communication.

46. Ms. Mendoza's "Inconsistently Meets" rating was directly at odds with this contemporaneous, documented record of Plaintiff's performance.

47. In or about August 2023, Dennis Aquino ("Mr. Aquino"), Senior Audit Manager, became Plaintiff's direct supervisor.

48. Throughout the remainder of 2023, Plaintiff participated in numerous audit engagements, including various issue validations and her role as audit coordinator for the Change Management Risk Assessment. Among the audit engagements were the Operations – HL Servicing – Single Point of Contact audit, which ran from July 19, 2023, through

September 21, 2023, and the 2023 Corporate Strategic Planning Horizontal audit, which ran from October 3, 2023, through November 28, 2023.

49. Plaintiff continued to receive positive engagement feedback throughout this period.

50. Specifically, on September 13, 2023, supervisor Daniel Saur formally recorded engagement feedback regarding Plaintiff's performance in the Operations – HL Servicing – Single Point of Contact audit. Mr. Saur documented that Plaintiff "managed [her] time well during this engagement," "accepted responsibility for multiple controls with testing required to be completed in a short time frame," and "properly prioritized [her] work when challenged with competing assignments and due dates." Regarding Project Management Areas of Opportunity, Mr. Saur recorded "[n]o areas of concern for Project Management." Regarding documentation, Mr. Saur stated that Plaintiff's "work papers only required adjustments which were mostly style related" and that she "welcomed feedback." Regarding communication, Mr. Saur noted that Plaintiff "set up recurring status meetings with the ETAG supervisor and AMSM early in the audit" and "was consistently well prepared to provide the LOB AIC with [her] fieldwork status during team calls and on business partner calls," recording "[n]o areas of concern for Communication."

51. The sole source of negative engagement feedback during this period came from Auditor-in-Charge Rose Ann Poquiz, who recorded engagement feedback on November 30, 2023, regarding Plaintiff's performance in the 2023 Corporate Strategic Planning Horizontal audit.

52. Ms. Poquiz's feedback identified several purported deficiencies in Plaintiff's project management and documentation. This feedback did not accurately reflect Plaintiff's actual performance. Rather, "areas of opportunity" cited against Plaintiff predated her assignment

to the audit, and Ms. Poquiz improperly attributed shortcomings to Plaintiff that fell within the responsibilities of other team members, including Ms. Poquiz herself.

53. In Plaintiff's 2023 year-end performance evaluation, Mr. Aquino rated Plaintiff as "Needs Improvement," stating that Plaintiff's "[p]erformance outcomes were significantly below expectations."

54. In support of his "Needs Improvement" rating, Mr. Aquino specifically and only referenced Plaintiff's performance in the 2023 Corporate Strategic Planning Horizontal audit involving Ms. Poquiz.

55. Plaintiff met with Mr. Aquino to discuss the 2023 year-end evaluation and inquired as to the basis for his rating, given his limited period of supervision. Mr. Aquino acknowledged that his assessment was based on a single audit, the 2023 Corporate Strategic Planning Horizontal audit involving Ms. Poquiz.

56. Mr. Aquino's evaluation was silent as to every other audit engagement Plaintiff completed in 2023, engagements for which she had received uniformly positive feedback from the supervisors and auditors-in-charge who worked with her.

57. The internal structure of the 2023 year-end evaluation further undermines its credibility. The "Successes and Achievements" section of Mr. Aquino's year-end evaluation is a near-verbatim reproduction of the identical section from Ms. Mendoza's 2023 mid-year review, despite the fact that the two reviews were authored by different supervisors, covering different time periods. The "Areas of Focus" section of Mr. Aquino's year-end evaluation likewise reproduces, nearly verbatim, the five enumerated documentation critiques from Ms. Poquiz's November 30, 2023, engagement feedback. That Mr. Aquino, who had supervised Plaintiff for only a matter of months, relied wholesale on the language of his

predecessors, without independent assessment and while wholly disregarding the documented record of Plaintiff's broader 2023 performance reflects that the "Needs Improvement" rating was not the product of independent observation or honest evaluation of Plaintiff's work.

58. At the time of these negative performance reviews, Mr. Aquino was aware of Plaintiff's prior FMLA leave as well as her fulltime telework accommodation in that (1) Plaintiff's FMLA leave was explicitly referenced in her mid-year and year-end evaluations; (2) Defendant's Accommodations Management team had previously sent written confirmation of Plaintiff's full-time telework accommodation directly to Plaintiff's Audit Director, Jona Mendoza, establishing that the accommodation was a known, documented feature of Plaintiff's employment status within Plaintiff's chain of command; and (3) Plaintiff was exercising her accommodation, working remotely from home, at the time Mr. Aquino supervised her.

59. Plaintiff's good performance continued into 2024, as documented by the following engagement feedback from additional supervisors:

a) On February 22, 2024, supervisor Emily Fisher formally recorded engagement feedback regarding Plaintiff's performance in the AMS for the BL&T - Sweep Vehicles audit. Ms. Fisher documented that Plaintiff "was able to effectively complete testing for 5 controls within the expected timelines" and "communicated status regularly to ensure [Ms. Fisher] did not have to chase [Plaintiff] down to get updates." Regarding documentation and testing, Ms. Fisher recorded that "[d]ocumentation was complete and well written," that Plaintiff's "workpapers required minimal review notes," and that Plaintiff "demonstrated critical thinking

skills," noting "[n]o feedback" under Areas of Opportunity. Regarding communication, Ms. Fisher recorded that Plaintiff "demonstrated good communication skills in obtaining the information needed to complete testing," again noting "[n]o feedback" under Areas of Opportunity.

b) Also on February 22, 2024, supervisor John Ware provided written engagement feedback for the Function Authority Entitlement DOC - Issue Validation audit, noting that Plaintiff "was responsible for prepping and co-leading meetings with line of business and technology issue contacts, coordinating requests and follow up questions, and communicating status with FICAT and ETAG audit teams," that she "attended all meetings and proactively provided statuses, and reached out for assistance as needed." Mr. Ware described the engagement as "more complex than normal" and stated that Plaintiff "did an effective job understanding, testing and documenting the control," and that the "FICAT team complemented her on her efforts" and Plaintiff "showed a positive attitude throughout the process."

c) In or around May 2024, Scott Curtner, Audit Manager – VP, CISA, ITIL-F, sent Plaintiff a formal recognition eCard through Defendant's Wells Fargo Recognition Central platform in connection with the Wells Fargo Asset Management issue validation audit. Mr. Curtner recognized Plaintiff's "excellent work" as AIC of the issue validation, stating that Plaintiff "built up her knowledge about the WFAM business and their corrective action mitigation methods and became a reliable subject matter expert on this topic," that she "developed a test spreadsheet structure of high-quality and in a timely manner," and that her "thoughtful consultation when addressing [Mr. Curtner's] questions and the questions from [Defendant's] second

level review was invaluable to [Defendant] producing a quality final validation product." Mr. Curtner further described Plaintiff as having "a professional demeanor and a skilled logical analysis." Notably, this recognition was copied directly to Mr. Aquino, placing him on notice of Plaintiff's strong AIC-level performance.

60. Mr. Aquino disregarded this documented record of strong performance entirely, neither incorporating the favorable engagement feedback into his formal evaluations nor acknowledging it in any of his conversations or performance updates with Plaintiff.

61. Instead, and in the face of unambiguous evidence of Plaintiff's consistent, well-documented performance throughout 2023 and into early 2024, Mr. Aquino issued Plaintiff an Informal Warning for Performance in April 2024 and assigned her a negative rating in her 2024 mid-year review.

62. Notably, Mr. Aquino assigned Plaintiff a negative rating in her 2024 mid-year review after Plaintiff, in June 2024, submitted a renewed accommodation request for continued full-time remote work and intermittent leave for MS-related medical appointments, treatment, and symptom flare-ups.

63. Each of Mr. Aquino's adverse actions was a stark departure from the documented record of Plaintiff's work product.

64. Mr. Aquino's campaign of hostility extended well beyond formal performance documents. Throughout 2023 and 2024, he repeatedly told Plaintiff during one-on-one meetings that "you're not doing your job" and "I'm going to fire you."

65. When Plaintiff sought to understand the basis for these assessments, Mr. Aquino told her he had discussed her performance with unnamed members of leadership who had said she

was not performing, and that he intended to rely on what they had said. Mr. Aquino refused to identify the individuals who allegedly reported poor work performance or provide Plaintiff with a single specific example of the alleged deficiencies.

66. The cumulative effect of Mr. Aquino's conduct, including the baseless criticism, the repeated threats of termination, and his refusal to engage constructively or provide Plaintiff any meaningful opportunity to respond to undisclosed concerns, severely undermined Plaintiff's professional confidence, directly aggravated her MS symptoms, and caused significant emotional distress.

67. Plaintiff formally raised concerns with Mr. Aquino's conduct in her 2024 mid-year self-evaluation, highlighting issues with poor leadership, lack of communication, and the manner in which her 2023 year-end performance rating had been handled.

68. Upon information and belief, Mr. Aquino's supervisors and/or "leadership team" received notification of Plaintiff's concerns through her 2024 mid-year self-evaluation.

69. In response to Plaintiff's 2024 mid-year evaluation, Mr. Aquino requested that Plaintiff revise her self-evaluation and stated that Plaintiff's comments "would not look good for him with his leadership team."

### Plaintiff's 2024 Accommodation Request and Denial

70. In or around June 2024, Plaintiff submitted an accommodation request to renew her telework accommodation through July 2025.

71. Plaintiff's renewed request included the same categories of accommodation previously approved: full-time remote work and intermittent leave for MS-related absences and medical appointments.

72. Plaintiff's treating physician completed Defendant's Medical Accommodation Form, certifying that Plaintiff's chronic neurological condition necessitated full-time remote work and that "due to [Plaintiff's] symptoms, it is medically necessary for her to continue to be allowed to work from home."

73. In the same form, Plaintiff's treating physician explained that Plaintiff's chronic neurological condition requires "ongoing medical treatment and may also result in periods of acute exacerbation requiring additional time away for treatment and recovery."

74. Given that Plaintiff's renewed accommodation request expressly sought intermittent leave for MS-related medical appointments, treatment, and symptom flare-ups, this request also constituted notice to Defendant that Plaintiff's need for leave may be for an FMLA-qualifying reason.

75. Defendant failed to provide Plaintiff with any eligibility notice in response to her June 2024 intermittent leave request, as required by 29 C.F.R. § 825.300(b).

76. Defendant likewise failed to provide Plaintiff with a written notice of rights and responsibilities in response to her June 2024 intermittent leave request, as required by 29 C.F.R. § 825.300(c).

77. Rather, Defendant ignored Plaintiff's written request for approximately two months.

78. After submitting her accommodation request in June 2024 and despite attempting contact on multiple occasions, Plaintiff was unable to reach her assigned Accommodations Management representative, Myeisha Henderson, for the entire months of June and July 2024. Consequently, Plaintiff escalated her request to Ms. Henderson's supervisor.

79. In early August, after Plaintiff contacted Ms. Henderson's supervisor, Ms. Henderson called Plaintiff and verbally confirmed that Ms. Henderson's review was complete and the

renewed accommodation request, including the request for fulltime remote work and intermittent leave, should be fully approved, pending final approval from Mr. Aquino.

80. Subsequently, on August 2, 2024, Ms. Henderson emailed Plaintiff with confirmation that, contrary to Ms. Henderson's prior communication, Defendant would be implementing a gradual, return-to-work schedule. Mr. Aquino was copied on this email.

81. The return-to-work schedule permitted full-time remote work only through October 2024, then required Plaintiff to report to the office one day per week in November 2024, two days per week in December 2024, and three days per week beginning January 2025.

82. The return-to-work schedule made no mention of intermittent leave.

83. This gradual return-to-work schedule directly contradicted Plaintiff's medical certification that full-time remote work and intermittent leave as needed was necessary, and further, failed to reasonably accommodate Plaintiff.

84. Defendant's failure to address Plaintiff's intermittent leave request, in violation of its obligations under 29 C.F.R. § 825.300, occurred despite Plaintiff's specific and documented request for intermittent leave and notwithstanding her eligibility for FMLA leave at the time.

85. Plaintiff immediately responded to Ms. Henderson by email, stating "I thought the accommodation request is for 1 year (to July 2025), however, below says 3 months. Could you let me know what change[d] in the duration [of] time since we last spoke?"

86. Ms. Henderson called Plaintiff and confirmed that Mr. Aquino was "not approving full-time accommodation" and that Plaintiff would have to "gradually start coming back into the office."

87. Defendant failed to engage in any meaningful interactive process with Plaintiff regarding her accommodation request. Rather than conducting an individualized assessment of Plaintiff's limitations or exploring potential options to address both her medical needs and any operational considerations, Defendant engaged in no dialogue with Plaintiff.

88. Defendant did not assess Plaintiff's specific limitations, seek to understand why a gradual return to the office was incompatible with her medical condition, or otherwise gather information necessary to evaluate the request.

89. Defendant also failed to consider or discuss possible alternative accommodations, request clarification from Plaintiff's treating provider, or articulate any operational need that would justify denying the requested telework accommodation.

90. Upon information and belief, Defendant conducted no undue hardship analysis.

91. Moreover, no undue hardship analysis is apparent from the record. Plaintiff's audit work had been performed entirely virtually throughout her career, with no demonstrated operational need for in-person presence, and Defendant had approved the same accommodation without issue for the preceding four years.

92. Upon information and belief, Defendant's denial of Plaintiff's request for full-time remote work as a disability accommodation was not an isolated occurrence. Defendant has a pattern and practice of denying or curtailing work-from-home accommodations to employees with disabilities, imposing return-to-office requirements that conflict with medical certifications, and failing to engage in the good faith interactive process required by the ADA. This pattern is reflected in prior legal proceedings brought against Defendant by other employees similarly situated to Plaintiff.

***Retaliatory and Discriminatory Conduct Following Accommodation Denial***

18

93. On or around August 9, 2024, Mr. Aquino called Plaintiff to inform her that she was being placed on a formal corrective action.

94. During the August 9, 2024 call, Mr. Aquino told Plaintiff she "should leave the company" because he was going to terminate Plaintiff unless she demonstrated Auditor-in-Charge performance on two specific audits.

95. The two audits Mr. Aquino referenced were CIB Markets - US FX Derivatives Sales & Trading and CIB Markets - US FX Spot Sales, Trading, and Payment Solution. However, on both of these audits, the Audit Scheduling Team had assigned Plaintiff to a staff role, not an Auditor-in-Charge role. Because Plaintiff was assigned a staff role on these audits, she would not be in a position to perform the Auditor-in-Charge tasks on which Mr. Aquino was evaluating her.

96. The formal corrective action lacked clear remediation steps and made it impossible for Plaintiff to meet the stated expectations.

### Plaintiff's Forced Transition to Disability Leave and Resulting Harm

97. As a direct and proximate result of Defendant's denial of her medically necessary accommodation and the hostile work environment orchestrated by Mr. Aquino, Plaintiff's MS symptoms severely deteriorated. Consequently, Plaintiff applied for and was approved for short term disability in or around August and September 2024.

98. Plaintiff's disability benefits were administered by Lincoln Financial Group, a third-party insurance carrier retained by Defendant to manage disability claims on behalf of its employees.

99. On September 9, 2024, Lincoln Financial approved Plaintiff's Short-Term Disability ("STD") claim, for a period beginning August 27, 2024.

19

100. Plaintiff's STD benefits were extended on multiple occasions as Defendant's failure to provide reasonable accommodation prevented her from returning to work.

101. Effective February 18, 2025, Plaintiff's claim transitioned from Short-Term Disability to Long-Term Disability ("LTD"), with Lincoln Financial notifying Plaintiff of this transition and confirming the continuity of her disability benefits under the LTD program.

102. Plaintiff's STD and LTD benefits were approved and administered exclusively by Lincoln Financial Group, an independent third-party insurer, based on Lincoln Financial's own review of Plaintiff's medical documentation and determination. Defendant played no role in approving, granting, or extending Plaintiff's disability benefits.

103. Plaintiff remains on LTD because Defendant's failure to provide reasonable accommodation prevented her from returning to work.

104. As a direct result of Defendant's conduct, Plaintiff has suffered and continues to suffer significant economic harm.

105. Upon transitioning to LTD in February 2025, Plaintiff's income was reduced to a fraction of her pre-disability earnings.

106. Plaintiff has also been required to pay out of pocket for benefits, including health insurance, that were previously covered as part of her employment with Defendant.

107. Plaintiff's economic losses are ongoing. She remains unable to return to work due to Defendant's failure to accommodate, and the full extent of her lost wages, lost benefits, and lost earning capacity will continue to accrue until she is able to resume full employment.

108.    In addition to economic losses, Plaintiff's MS has deteriorated, and she has suffered loss of professional reputation and severe emotional distress as a result of Defendant's conduct described herein.

**<u>FIRST CAUSE OF ACTION</u>**
**Violation of the Americans with Disabilities Act of 1990, as Amended 42 U.S.C. § 12101, et seq—Failure to Accommodate**

109.    Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

110.    Plaintiff is a "person" and "employee," and Defendant is an "employer" and a "covered entity" as those terms are defined in 42 U.S.C. § 12101, et seq.

111.    At all relevant times, Plaintiff was a qualified individual with an actual or perceived disability. Specifically, Plaintiff has MS, a neurological condition that causes sleep issues, fatigue, cognitive impairment, strength and sensory deficits, gait imbalance, coordination issues, and bladder dysfunction. Plaintiff's condition substantially limits major life activities including but not limited to walking, sleeping, concentrating, operating major bodily functions, thinking, and working.

112.    At all relevant times, Plaintiff was performing her job at a level that met and exceeded Defendant's legitimate business expectations.

113.    Defendant was on notice of Plaintiff's disability and her need for accommodation. Plaintiff notified Defendant of her MS diagnosis in or around March or April of 2015. Plaintiff thereafter submitted annual accommodation requests, each of which Defendant approved without issue from 2020 through July 2024.

21

114. At no point during the four years Plaintiff worked under the telework accommodation did her remote work arrangement negatively affect her performance or prevent her from meeting Defendant's legitimate business expectations.

115. In June 2024, Plaintiff submitted a renewal of her telework accommodation request. Her treating physician completed Defendant's medical accommodation form, certifying that full-time remote work was medically necessary through July 3, 2025, and that Plaintiff's condition also required intermittent leave for treatment and recovery.

116. Defendant's accommodations management team ignored and/or failed to process Plaintiff's telework accommodation request for approximately two months. Plaintiff's Accommodations Management representative, Ms. Henderson, only provided Plaintiff with an update regarding her request after Plaintiff contacted Ms. Henderson's supervisor.

117. Ms. Henderson initially confirmed that Plaintiff's telework accommodation would be approved in full, as it had been since 2020, pending final approval from Plaintiff's supervisor, Mr. Aquino.

118. Despite Ms. Henderson's communications, Plaintiff's request was not approved. Rather, Defendant imposed a return-to-work schedule upon Plaintiff, which directly contradicted Plaintiff's accommodation request and medical documentation.

119. Plaintiff's telework accommodation request is not a matter of personal preference, but rather, is medically necessary.

120. By imposing a return-to-work schedule, Defendant failed to provide Plaintiff with a reasonable accommodation.

121. Defendant failed to engage in the good faith interactive process in violation of 29 C.F.R. § 1630.2(o)(3). Particularly, Defendant did not conduct an individualized

22

assessment of Plaintiff's limitations, engage in a dialogue with Plaintiff regarding her accommodation, seek clarification from Plaintiff's treating provider, explore alternative accommodations, or articulate any operational need or hardship that would justify denying Plaintiff's requested accommodation.

122. Defendant had approved the identical accommodation for four consecutive years without identifying any undue hardship, and no hardship was present as of the date of the conduct described hereinabove.

123. Upon information and belief, Defendant has a pattern and practice of denying or curtailing work-from-home accommodations to employees with disabilities, imposing return-to-office requirements that conflict with medical certifications, and failing to engage in the good faith interactive process required by the ADA.

124. As a direct and proximate result of Defendant's failure to provide a reasonable accommodation, Plaintiff's MS symptoms worsened, and she was forced to cease working and apply for disability benefits.

125. Plaintiff remains on LTD because Defendant's failure to provide reasonable accommodation prevented her from returning to work.

126. As a direct and proximate result of Defendant's failure to provide reasonable accommodation, Plaintiff has suffered and continues to suffer substantial lost wages, reduced income, loss of employee benefits, emotional distress, mental pain and anguish, and harm to her professional standing.

127. Plaintiff is entitled to attorneys' fees and costs incurred in this matter pursuant to 42 U.S.C. § 12205.

128. Plaintiff is further entitled to any and all relief under the ADA, 42 U.S.C. § 12117(a), including equitable relief.

## SECOND CAUSE OF ACTION
**Violation of the Americans with Disabilities Act of 1990, as Amended 42 U.S.C. § 12101, et seq—Retaliation**

129. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

130. Plaintiff engaged in protected activity under the ADA on multiple occasions, including by requesting and renewing her telework accommodation annually from 2020 through 2024, opposing Defendant's denial of her 2024 accommodation request, and raising concerns about the manner in which her accommodation and her performance were being handled.

131. Defendant had actual knowledge of Plaintiff's disability-related status and accommodation history at all relevant times. Plaintiff's telework accommodation was first approved in 2020 and renewed each year, and Defendant's Accommodations Management team sent formal written confirmation of the approved accommodation directly to Plaintiff's supervisor(s), placing Plaintiff's disability status and accommodation history squarely within her supervisory chain of command.

132. When Plaintiff submitted her renewed accommodation request in 2024, Ms. Henderson confirmed that she would seek approval from Mr. Aquino. Mr. Aquino was copied directly on the August 2024 accommodation-related emails including the return-to-work schedule and Plaintiff's disputes.

133. At all times relevant, Plaintiff also worked remotely under Mr. Aquino's direct supervision, making her accommodation plainly visible to him on a daily basis.

134. Following each instance of Plaintiff's protected activity, Defendant, through Mr. Aquino, subjected Plaintiff to a series of escalating materially adverse employment actions.

135. At the 2023 year-end review, while Plaintiff was actively working under her telework accommodation, Mr. Aquino rated Plaintiff as "Needs Improvement" based exclusively on a single engagement, the 2023 Corporate Strategic Planning Horizontal audit, while wholly disregarding the documented positive feedback Plaintiff received from every other supervisor during the same period.

136. Throughout 2023 and 2024, Mr. Aquino repeatedly told Plaintiff during one-on-one meetings that she was "not doing her job" and that he intended to terminate her employment, while simultaneously refusing to identify any specific deficiencies or the unnamed members of leadership he claimed to have consulted.

137. Mr. Aquino continued to issue negative performance evaluations in 2024, despite contemporaneous positive engagement feedback from multiple supervisors and managers who directly observed Plaintiff's work.

138. After Plaintiff submitted her accommodation renewal in June 2024, Defendant's Accommodation Management team communicated that Plaintiff's accommodation would be approved in full. Despite this, Mr. Aquino unilaterally overrode that determination and denied Plaintiff's telework accommodation request.

139. On August 5, 2024, Plaintiff disputed the denial and imposition of the return-to-work schedule by email.

140. A few days later, on August 9, 2024, Mr. Aquino placed Plaintiff on a formal corrective action. This corrective action directly contradicted the positive engagement feedback Plaintiff received from other managers and/or supervisors.

141. Further, Mr. Aquino stated that Plaintiff should leave the company because he intended to terminate her employment unless she demonstrated Auditor-in-Charge performance on two specific audits.

142. The audits to which Mr. Aquino referred were audits on which the Audit Scheduling Team had assigned Plaintiff in a staff role, not as Auditor-in-Charge. Plaintiff was therefore structurally prevented from performing the very criteria on which her continued employment was conditioned.

143. Each of the foregoing adverse actions would dissuade a reasonable employee in Plaintiff's circumstances from making or supporting a charge of discrimination or exercising rights protected under the ADA.

144. A causal connection exists between Plaintiff's protected activity and each adverse action taken against her, as demonstrated by the close temporal proximity between Plaintiff's accommodation requests and the adverse actions that followed, the pretextual nature of the documentation supporting those adverse actions, Mr. Aquino's escalating conduct, and Mr. Aquino's denial of Plaintiff's accommodation request for no apparent reason.

145. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff's MS symptoms worsened, and she was forced to cease working entirely and apply for disability benefits.

146. Plaintiff remains on LTD because Defendant's failure to provide reasonable accommodation prevented her from returning to work.

147.     As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered and continues to suffer substantial lost wages, reduced income, loss of employee benefits, emotional distress, mental anguish, and harm to her professional standing.

148.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 12205.

149.     Plaintiff is further entitled to any and all relief available under the ADA, including equitable relief.

## THIRD CAUSE OF ACTION
### Violation of the Americans with Disabilities Act of 1990, as Amended 42 U.S.C. § 12101, et seq—Hostile Work Environment

150.     Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

151.     Beginning in or around mid-2023 and continuing through August 2024, Defendant, through Mr. Aquino, subjected Plaintiff to a sustained campaign of harassing and discriminatory conduct because of her actual or perceived disability.

152.     This conduct was unwelcome and occurred continuously throughout Mr. Aquino's supervisory tenure.

153.     Mr. Aquino's harassing conduct included, but was not limited to, the following: (1) repeatedly telling Plaintiff during one-on-one meetings that she was "not doing her job" and that he was "going to fire her," without identifying a single specific deficiency; (2) refusing to provide Plaintiff any meaningful opportunity to respond to undisclosed performance concerns; (3) issuing predetermined negative performance evaluations that were directly contradicted by the contemporaneous, documented record of Plaintiff's work; (4) fabricating a year-end evaluation by copying nearly verbatim from a prior supervisor's review while wholly disregarding uniformly positive feedback from every other supervisor

who observed Plaintiff's work that year; (5) placing Plaintiff on a formal corrective action premised on criteria she was structurally prevented from meeting; and (6) unilaterally overriding a determination by Defendant's own Accommodations Management team that Plaintiff's full-time remote work accommodation should be approved.

154. This pattern of conduct was directly connected to Plaintiff's actual or perceived disability status and accommodation. Mr. Aquino's escalating hostility intensified following, and in temporal proximity to, Plaintiff's exercise of disability-related rights, including her renewal of the telework accommodation in June 2024, her dispute of Defendant's denial of that accommodation in August 2024, and her ongoing exercise of the accommodation on a daily basis under Mr. Aquino's direct supervision.

155. Mr. Aquino's conduct was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and create a hostile and abusive working environment. The harassment was not an isolated incident but rather a continuous and escalating series of actions spanning more than a year.

156. Mr. Aquino's hostility directly and foreseeably aggravated Plaintiff's MS symptoms. As a direct and proximate result of the hostile work environment he created and sustained, Plaintiff's condition deteriorated to the point that she was forced to cease working entirely and apply for short-term disability benefits in August 2024. Her disability benefits subsequently transitioned to long-term disability, with a corresponding reduction in her income to a fraction of her pre-disability earnings.

157. Plaintiff has also been required to pay out of pocket for benefits, including health insurance, that were previously covered as part of her employment with Defendant.

28

158. Defendant is vicariously liable for Mr. Aquino's conduct because he served as Plaintiff's direct supervisor and his harassment culminated in a tangible employment action, Plaintiff's forced transition to long-term disability and the resulting reduction in her income and benefits.

159. As a direct and proximate result of Defendant's creation and maintenance of a hostile work environment in violation of the ADA, Plaintiff has suffered and continues to suffer substantial lost wages, reduced income, loss of employee benefits, worsened medical condition, emotional distress, mental anguish, and significant harm to her professional reputation and standing.

160. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 12205.

161. Plaintiff is further entitled to any and all relief available under the ADA, 42 U.S.C. § 12117(a), including equitable relief.

**FOURTH CAUSE OF ACTION**
**Violations of Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1)—Interference**

162. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

163. At all times relevant, Plaintiff was an eligible employee within the meaning of the FMLA. Plaintiff had been employed by Defendant for well over twelve months preceding each of her FMLA leave requests and had worked the requisite hours during the preceding twelve-month period.

164. At all times relevant, Defendant was a covered employer under the FMLA.

165. Plaintiff's MS constitutes a serious health condition within the meaning of the FMLA.

29

166. At all times relevant, Plaintiff was meeting the legitimate performance expectations of her position.

167. Plaintiff gave Defendant adequate notice of her intention to take FMLA leave for her medical condition prior to November 2022 through March 12, 2023.

168. Defendant granted Plaintiff's FMLA leave request. Her approved leave ran from November 11, 2022, through March 12, 2023.

169. Defendant interfered with, restrained, and denied Plaintiff's exercise of her FMLA rights by subjecting her to a litany of negative performance reviews within months of her returning from FMLA leave.

170. Shortly after Plaintiff's return from FMLA leave in March of 2023, Ms. Mendoza issued a mid-year performance review rating Plaintiff as "Inconsistently Meets Expectations." This review was based on a single engagement covering only a few weeks of post-return work, and directly contradicted by the only contemporaneous engagement feedback from that period.

171. In addition, Plaintiff's June 2024 accommodation renewal expressly included a request for intermittent leave for treatment and recovery.

172. Plaintiff's renewed accommodation request constituted notice to Defendant that Plaintiff's need for leave may be for an FMLA-qualifying reason.

173. Defendant failed to respond to Plaintiff's request for approximately two months.

174. Defendant further failed to provide Plaintiff with any eligibility notice, as required by 29 C.F.R. § 825.300(b), and a written notice of rights and responsibilities, as required by 29 C.F.R. § 825.300(c).

175. Defendant's failure to provide the required eligibility and rights and responsibilities notices deprived Plaintiff of information she was entitled to receive under the FMLA and prevented her from making fully informed decisions about the exercise of her federal leave rights during a period in which Defendant was simultaneously subjecting her to escalating adverse employment actions and denying her medically necessary accommodation.

176. Defendant interfered with, restrained, and denied Plaintiff's right to intermittent FMLA leave by failing to engage in any meaningful process regarding the intermittent leave component of Plaintiff's 2024 accommodation request, imposing a return-to-work schedule that wholly disregarded Plaintiff's requests for intermittent leave, and allowing Mr. Aquino to exercise veto authority over a determination by Defendant's own accommodation management team.

177. Defendant further interfered with Plaintiff's FMLA rights by creating and sustaining a hostile work environment in the wake of Plaintiff's protected leave in 2023 and after Plaintiff's renewed request in 2024, including repeated threats of termination, predetermined negative performance evaluations, and ultimately a formal corrective action premised on impossible criteria.

178. This conduct had the purpose and effect of deterring Plaintiff from exercising her FMLA rights, including her right to take future intermittent leave.

179. Defendant's violation of the FMLA, 29 U.S.C. § 2615(a)(1), by interfering with Plaintiff's lawful exercise of her rights under FMLA, and retaliating against her as described herein, was willful, lacking good faith, and in reckless disregard for Plaintiff's rights under the FMLA.

31

180. As a direct and proximate result of Defendant's interference with Plaintiff's FMLA rights, Plaintiff was forced to cease working entirely in August 2024 and apply for disability benefits. Plaintiff's income was reduced to a percentage of her full salary upon her transition to long-term disability in February 2025, and Plaintiff has also been required to pay out of pocket for benefits that were previously covered.

181. Plaintiff has suffered and continues to suffer lost wages, lost benefits, loss of earning capacity, harm to her professional reputation, and severe emotional distress. Plaintiff is entitled to all relief available under the FMLA, including but not limited to lost wages, compensatory damages, liquidated damages, and attorneys' fees and costs.

<u>**FIFTH CAUSE OF ACTION**</u>
**Violations of the Family and Medical Leave Act, 29 U.S.C. § 2615(a)(2)—Retaliation**

182. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

183. Plaintiff engaged in protected activity under the FMLA on multiple occasions: first, by taking approved FMLA leave from November 11, 2022, through March 12, 2023; and second, in June 2024, by submitting an accommodation request that expressly included a request for intermittent leave for MS-related treatment and recovery, which constituted notice to Defendant that Plaintiff's need for leave may be for an FMLA-qualifying reason.

184. Defendant had actual knowledge of Plaintiff's protected activity. Plaintiff's FMLA leave was expressly referenced in both her 2023 mid-year and year-end performance evaluations, confirming that her supervisory chain was aware of and considered her leave status in connection with her formal performance record. Defendant's knowledge further extended to Plaintiff's June 2024 intermittent leave request, which was submitted to

32

Defendant's accommodation management team and directed to Mr. Aquino for final approval.

185. Following Plaintiff's exercise of FMLA rights, Defendant subjected her to a series of escalating adverse employment actions as described herein.

186. A causal connection exists between Plaintiff's protected activity and the adverse actions taken against her, as demonstrated by the close temporal proximity between Plaintiff's FMLA leave and the first negative performance evaluation issued upon her return, the escalating pattern of adverse action following each subsequent exercise of FMLA rights, the pretextual nature of the performance documentation supporting those actions, and Mr. Aquino's express awareness of Plaintiff's FMLA history and 2024 intermittent leave request.

187. Defendant's violation of the FMLA, 29 U.S.C. § 2615(a)(2), by interfering with Plaintiff's lawful exercise of her rights under FMLA, and retaliating against her as described herein, was willful, lacking good faith, and in reckless disregard for Plaintiff's rights under the FMLA.

188. As a direct and proximate result of Defendant's interference with Plaintiff's FMLA rights, Plaintiff was forced to cease working entirely in August 2024 and apply for disability benefits. Plaintiff's income was reduced to a percentage of her full salary upon her transition to long-term disability in February 2025, and Plaintiff has also been required to pay out of pocket for benefits that were previously covered.

189. Plaintiff has suffered and continues to suffer lost wages, lost benefits, loss of earning capacity, harm to her professional reputation, and severe emotional distress.

Plaintiff is entitled to all relief available under the FMLA, including but not limited to lost wages, compensatory damages, liquidated damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief:

1. Trial by jury;

2. An Order awarding Plaintiff damages for Defendant's violation of the ADA, including backpay, front pay, lost employment benefits, and any other compensation denied or lost because of Defendant's violation of the ADA;

3. An Order awarding Plaintiff damages for Defendant's violation of the FMLA, including backpay, lost wages, employment benefits, liquidated damages, and any other compensation denied or lost because of Defendant's violation of the FMLA;

4. An Order awarding Plaintiff compensatory damages for emotional distress, pain and suffering, inconvenience, and/or mental anguish in an amount to be proven at trial;

5. An Order awarding Plaintiff the costs of this action;

6. An Order awarding Plaintiff reasonable attorneys' fees;

7. An Order awarding Plaintiff pre-judgment and post-judgment interest at the highest rates allowed by law; and

8. An Order granting any other necessary or appropriate relief to which Plaintiff is entitled under the law.

Respectfully submitted,

This the 8th day of May, 2026.

**Burts Law, PLLC**

*/s/Kathryn Roseman*
Kathryn Roseman (NCSB: 62632)
*/s/ M. Anthony Burts II*
M. Anthony Burts II (NCSB: 49878)
*Attorneys for Plaintiff*
PO Box 102
Newton, NC 28658
T. (704) 751-0455
F. (704) 413-3882
E. katie@burtslaw.com
E. anthony@burtslaw.com